1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   MARCO BENITEZ,                )  Civil No. 12-1237-W(WVG)
                                    )
12                  Petitioner,     )  REPORT AND RECOMMENDATION
                                    )  DENYING PETITION FOR WRIT
13   v.                             )  OF HABEAS CORPUS
                                    )
14   RALPH M. DIAZ, Warden,         )
                                    )
15                  Respondent.     )
                                    )
16   _____ )

17

18                                  I

19                            INTRODUCTION

20        Petitioner, Marco Benitez (hereafter "Petitioner"), a state

21   prisoner proceeding with counsel, has filed a Petition for Writ of

22   Habeas Corpus pursuant to 28 U.S.C. § 2254 (hereafter "Petition")

23   challenging his conviction for two counts of robbery, two counts of

24   carjacking, and the unlawful taking of a vehicle, as well as a true

25   finding of a gang enhancement.  (Petition at 1.)  Petitioner

26   contends that habeas relief is proper because his right to effective

27   assistance of counsel was violated when his trial counsel failed to

28

1   request a standard jury instruction regarding gang activity

2   evidence.  (Petition at 11-12.)

3        This Court has reviewed the Petition, Respondent's Answer,

4   Petitioner's Traverse, and all supporting documents submitted by the

5   parties.  Based on the documents and evidence presented, and for the

6   reasons set forth below, this Court finds that Petitioner is not

7   entitled to the relief requested and RECOMMENDS that the Petition be

8   DENIED.

9                                  II

10                        FACTUAL BACKGROUND

11       This Court gives deference to state court findings of fact

12   and presumes them to be correct.  See 28 U.S.C. § 2254(e)(1); see

13   also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding findings of

14   historical fact, including inferences properly drawn from such

15   facts, are entitled to statutory presumption of correctness).  The

16   facts as found by the state appellate court are substantially set

17   forth below: (see Respondent's Lodgment No. 5 at 2-8.)

18       The crimes in this case occurred in San Marcos, California,

19   where two rival gangs operate: Varios San Marcos (VSM, also known as

20   "Ghost Town") and South Los.  Petitioner is a member of the VSM

21   gang.

22       On February 18, 2008, a little after midnight, James Novet

23   was robbed while he was walking home from work ("the Novet rob-

24   bery").  The robbers jumped out of an older model white car, pointed

25   a gun at him, and took his cell phone and wallet.  As the robbers

26   went back to the car, they said, "You just got jacked by Ghost

27   Town."

28

12cv1237

1    Two hours after Novet was robbed, Julieta Santiago and Mario

2    Rodriguez were the victims of a carjacking and robbery ("the

3    Santiago/Rodriguez robbery").  On February 18, 2008, at about 2:00

4    a.m., Santiago and Rodriguez were in Santiago's Ford Taurus in the

5    parking lot of an apartment complex.  The perpetrators got out of an

6    older model white or cream-colored car and pointed a gun at

7    Santiago.[1]  One of them threw a bicycle in front of Santiago's car,

8    stating "That's what you are going to use because we're going to

9    take your car."  After Santiago and Rodriguez got out of the car,

10   one of the robbers placed a sharp object at Rodriguez's neck and

11   took his wallet.  Two of the perpetrators drove away in Santiago's

12   car, and two others left in the white car. After the perpetrators

13   left, Santiago and Rodriguez called the police.

14   The victims of the two incidents were unable to identify the

15   perpetrators.[2]  However, as discussed below, the perpetrators were

16   identified to the police by a 15-year-old male, Juan L., who was

17   with the perpetrators during the crimes.  Juan told the police that

18   the offenses were committed by Petitioner and two other individuals

19   (Abraham Ibarra and George Lopez).  At trial, Juan recanted his

20   statements identifying Petitioner, claiming that only Ibarra and

21   Lopez were with him during the offenses.  The jury was presented

22

23   [1]The gun used in both the Novet robbery and the Santiago/Rodriguez robbery
     was determined to be a toy gun.

24   [2]When Novet was interviewed by the police, he stated he might be able to
     identify the driver but he was not sure.  When Novet was shown a photographic
25   line-up which included Petitioner's picture, he was unable to make an
     identification.  He also was unable to identify Petitioner at the preliminary
26   hearing.  At trial, Novet testified that Petitioner looked "familiar," but he had
     not been "paying that much attention" and could not positively identify him.
27   Santiago and Rodriguez were unable to make an identification because the
     perpetrators had their faces covered.
28   The victims did identify a photograph of a gold Cadillac belonging to
     Petitioner's girlfriend as depicting a vehicle that looked the same or similar to
     the car used by the perpetrators.

12cv1237

1   with Juan's recorded statements to the police identifying Petitioner

2   as one of the perpetrators.  At trial, the defense theory was that

3   Juan's statements identifying Petitioner were not credible, and

4   although the offenses may have been committed by a group of gang

5   members, Petitioner was not with the group at the time of the

6   offenses and was not a perpetrator.

7          Juan was apprehended after the driver of Santiago's stolen

8   Ford Taurus engaged the police in a vehicular pursuit.  On the night

9   the police received the carjacking report, they spotted Santiago's

10  Ford Taurus with four people inside.  The Ford Taurus sped away,

11  followed by police units, until the Ford got stuck in a muddy field

12  and the occupants fled on foot.  The police caught Juan, one of the

13  occupants.  Novet's cell phone was in Juan's pocket.  Inside the

14  stolen Ford Taurus, the police found a cell phone belonging to

15  Petitioner's girlfriend with photos of Petitioner stored inside the

16  phone.

17         In a recorded interview on February 18, 2008, Juan initially

18  told the police the carjacking was committed by several of his

19  friends, including a man named Jose Hernandez.  Later, during this

20  same interview, Juan stated his friend's name was actually Marcos

21  Hernandez.  On February 21, 2008, Petitioner was arrested after the

22  police found him sleeping in a van in front of an apartment where

23  the police were executing a search warrant in an unrelated case.

24  After Petitioner's arrest, on February 26, 2008, Juan was arrested

25  again, and questioned by the police.  In this second recorded

26  interview, after Juan was told that "everybody" had been arrested

27  and interviewed about the prior week's incidents, Juan told the

28

12cv1237

1    police that Marcos Hernandez was, in fact, Petitioner (i.e., Marco

2    Benitez).

3          During the two recorded interviews, Juan described Peti-

4    tioner's participation in both the Novet robbery and the

5    Santiago/Rodriguez robbery.  Juan stated that he, Petitioner,

6    Ibarra, and Lopez were in the Cadillac belonging to Petitioner's

7    girlfriend.  Petitioner was driving.  According to Juan, they were

8    looking for "gangbangers."  To this effect, Ibarra stated, "Let's go

9    look for Sops [i.e., South Los gang members]."  They were also

10   looking for gas money, and they said, "Whoever we see, we're gonna

11   jack him."  When they saw Novet walking, they said "Let's jack this

12   fool." Petitioner, Ibarra, and Lopez got out of the car.  Petitioner

13   pointed a fake gun at Novet; Ibarra searched Novet's pockets; and

14   Lopez pushed Novet.  After robbing Novet, they went to a convenience

15   store, where Petitioner bought chips and soup.  At trial, the

16   convenience store clerk identified Petitioner as a man who on

17   February 18, 2008, came into the store at about 1:00 a.m., purchased

18   beer, chips, and soup, and then left in a gold Cadillac.[3]

19         With respect to the Santiago/Rodriguez robbery, Juan told the

20   police that when they saw Santiago and Rodriguez in the Ford Taurus,

21   his friends decided to "get 'em."  Petitioner told Juan to get in

22   the driver's seat of the Cadillac, and Juan complied.  Petitioner

23   and the others got out of the Cadillac.  Petitioner put the toy gun

24   to Santiago's head.  Ibarra dropped the bicycle in front of the Ford

25   Taurus and put a screwdriver in Rodriguez's face.  Petitioner and

26   Ibarra drove away in the Ford Taurus, and Juan and Lopez left in the

27

28
         [3]The jury was shown a surveillance video and photographs of the customer
     identified by the clerk as Petitioner.

12cv1237

1  Cadillac.  Juan and Lopez dropped the Cadillac off at Petitioner's
2  girlfriend's home, and they joined the others in the stolen Ford
3  Taurus.

4      Juan told the police that he and Ibarra were not VSM gang
5  members, but that Petitioner was, and that Lopez had not yet been
6  "jumped into the gang" but the gang was testing him.

7      Detectives Ricardo Lopez and David Collins testified on
8  behalf of the prosecution as gang experts.  Detectives Lopez and
9  Collins testified that VSM claims San Marcos as its territory, and
10 it has a history of committing offenses such as murder, assault with
11 a deadly weapon, carjacking, robbery, burglary, battery, and
12 scrawling graffiti.  Petitioner has been documented as a VSM member
13 based on law enforcement criteria, whereas Ibarra, Lopez, and Juan
14 have not.  However, all of them have been associated with the gang.
15 In July 2007, Ibarra was shot at by a South Los gang member, and
16 during this incident, the assailant called Ibarra a VSM member.  In
17 September 2007, the police contacted Ibarra when he was associating
18 with documented VSM members.  Lopez was arrested along with a
19 documented VSM gang member for a vehicular and residential burglary,
20 and his moniker "G-Boy" has been observed on graffiti.  The current
21 case was the first police contact with Juan.  Juan admittedly grew
22 up with VSM members, and the police consider him a VSM associate.

23     Detectives Lopez and Collins testified at trial that
24 associates who hang out with gang members and want to join the gang
25 must prove their worth by committing crimes.  This includes the
26 process of "being tested" to see if the associate is worth being
27 part of the gang.  The associate will typically start with graffiti,
28 and then progress to violent crimes.  To be accepted into the gang,

12cv1237

1   the associate must be willing to do the things he is told to do for

2   the gang.  An associate who willingly follows the orders of a gang

3   leader, especially to commit violent crimes, will easily be accepted

4   into the gang.

5          Detective Collins opined that the Novet robbery was committed

6   for the benefit of the gang or in association with the gang.  To

7   support this assertion, he cited Juan's statements that they were

8   looking for gangbangers and Sops; the fact that the street they were

9   driving on was an area associated with the South Los gang; the theft

10  of the cell phone which can be passed around through the gang or

11  sold; and the statement to the victim that he had just been "jacked

12  by Ghost Town" which would instill fear in the community.  Detective

13  Collins provided the same opinion for the carjacking/robbery of

14  Santiago and Rodriguez, stating that these crimes were committed

15  about two hours after the first crime when they went looking for

16  gangbangers; the property they gained from the first crime was

17  "minimal" compared to what they usually acquire; and they took a car

18  which is "a lot bigger prize to them" and something the gang can

19  use.

20         Detective Collins explained that gang members use stolen cars

21  to commit other crimes so they are not easily identified by the

22  police.  Collins stated that in this case, when the police spotted

23  them, they fled in the car and crashed it; that if no one had been

24  caught, the police would have acquired only a stolen car.  Further-

25  more, Collins explained that because Petitioner was the only

26  documented gang member, the other perpetrators (who were gang

27  associates) would have looked to him for direction.  The carjacking

28  permitted the gang associates to show what they acquired for the

1    gang, and then let the gang's members use the stolen car, or "G-

2    ride", to commit other crimes.   Collins stated that the fact the

3    perpetrators did not yell out their gang name during the offense did

4    not alter his opinion.   He testified that sometimes during the

5    commission of crimes, gang members yell out their gang affiliation

6    and sometimes they do not.   He stated the public in San Marcos knows

7    about the gangs; the gang members did not need to yell out their

8    gang name "for the victims to know they just got their car carjacked

9    by gang members"; and the crime was done to intimidate the commu-

10   nity.

11                                 III

12                      PROCEDURAL BACKGROUND

13        In San Diego Superior Court case number SCD211986, a jury

14   found Petitioner guilty of robbery (Cal. Penal Code § 211, counts 1A

15   & 4A); carjacking [Cal. Penal Code, § 215.5(a); counts 2 & 3]; and

16   the unlawful taking of a vehicle [Cal. Penal Code § 10851(a); counts

17   5A & 1B].   (Respondent's Lodgment No. 1 at 341-47.)   The jury found

18   true the gang enhancement. [Cal. Penal Code § 186.22(b)(1); counts

19   1A, 4A, & 5A.]   (Id.)   The trial court found true that Petitioner

20   had one prior vehicle theft conviction. [Cal. Penal Code §

21   666.5(a)], (Respondent's Lodgment No. 1 at 348.)   Petitioner was

22   sentenced to a total of twenty-eight years to life in state prison.

23   (Id.)

24        Petitioner appealed his convictions to the California Court

25   of Appeal. (Respondent's Lodgment No. 3.)   Respondent also filed an

26   opposition brief. (Respondent's Lodgment No. 4.)   On December 1,

27   2010, the Court of Appeal affirmed Petitioner's convictions.

28   (Respondent's Lodgment No. 5.)   On January 24, 2011, Petitioner

1   filed a Petition for Review in the California Supreme Court.

2   (Respondent's Lodgment No. 6.) On March 4, 2012, the California

3   Supreme Court denied the Petition without comment. (Respondent's

4   Lodgment No. 7.)

5       On May 22, 2012, Petitioner filed a Petition for Writ of

6   Habeas Corpus in this Court. On August 10, 2012, Respondent filed

7   an Answer to the Petition. On August 21, 2012, Petitioner filed a

8   Traverse to Respondent's Answer.

9                   IV

10            <u>SCOPE OF REVIEW</u>

11      This Petition is governed by Title 28, United States Code, §

12  2254, as amended by the 1996 Antiterrorism and Effective Death

13  Penalty Act ("AEDPA"). Section 2254(a) sets forth the following

14  scope of review for federal habeas corpus claims:

15       The Supreme Court, a Justice thereof, a circuit judge, or
         a district court shall entertain an application for a writ

16       of habeas corpus in behalf of a person in custody pursuant
         to the judgment of a State court only on the ground that

17       he is in custody in violation of the Constitution or laws
         or treatises of the United States.  28 U.S.C. § 2254(a).

18
    As amended, 28 U.S.C. § 2254(d) reads:
19

20       (d) An application for a writ of habeas corpus on behalf
         of a person in custody pursuant to the judgment of a State

21       court shall not be granted with respect to any claim that
         was adjudicated on the merits in State court proceedings

22       unless the adjudication of the claim-

23       (1) resulted in a decision that was <u>contrary to</u>, or
         involved an <u>unreasonable application</u> of, clearly

24       established Federal law, as determined by the Supreme
         Court of the United States; or

25       (2) resulted in a decision that was based on an
         <u>unreasonable determination</u> of the facts in light of

26       the evidence presented in the State court proceeding.
         28 U.S.C. § 2245(d)(1)-(2) (emphasis added).

27

28

12cv1237

1    "AEDPA establishes a 'highly deferential standard for
2   evaluating state-court rulings, which demands that state-court
3   decisions be given the benefit of the doubt.'" Womack v. Del Papa,
4   497 F.3d 998, 1001 (9th Cir. 2007) [quoting Woodford v. Viscotti,
5   537 U.S. 19, 24 (2002)].  To obtain federal habeas relief, Peti-
6   tioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  See
7   Williams v. Taylor, 529 U.S. 362, 403 (2000).  The Supreme Court has
8   ruled that the "contrary to" clause of § 2254(d)(1) permits a grant
9   of habeas relief "if the state court arrives at a conclusion
10  opposite to that reached by this Court on a question of law or if
11  the state court decides a case differently than this Court has on a
12  set of materially indistinguishable facts." Id. at 412-13.  The
13  Supreme Court has also interpreted the "unreasonable application"
14  clause of § 2254(d)(1) to allow a grant of "the writ if the state
15  court identifies the correct governing legal principle from this
16  Court's decisions but unreasonably applies that principle to the
17  facts of the prisoner's case." Id. at 413.  The Supreme Court has
18  clarified that under § 2254(d)(2), even an erroneous or incorrect
19  application of clearly established federal law does not support a
20  habeas grant, unless the state court's application was "objectively
21  unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

22   When there is no reasoned decision from the state's highest
23  court, the Court "looks through" to the underlying appellate court
24  decision. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991).  If
25  the dispositive state court order does not "furnish a basis for its
26  reasoning," federal habeas courts must conduct an independent review
27  of the record to determine whether the state court's decision is
28  contrary to, or an unreasonable application of, clearly established

12cv1237

1  Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 981-82 (9th

2  Cir. 2000) (overruled on other grounds by Lockyer, 538 U.S. at 75-

3  76).   A state court need not cite Supreme Court precedent when

4  resolving a habeas corpus claim.   Early v. Packer, 537 U.S. 3, 8

5  (2002).  Absent citations to Supreme Court precedent, habeas relief

6  is not merited if the state court decision neither contradicts the

7  reasoning nor the result of Supreme Court rulings.   Id.

8                                    V

9                              DISCUSSION

10      Petitioner claims that his constitutional right to effective

11  assistance of counsel was violated by his attorney's failure to

12  request a standard jury instruction on gang activity evidence.

13  (Petition at 11-12.)

14      A.  Petitioner's Constitutional Right To Effective Assis-
            tance Of Counsel Was Not Violated Because No Reasonable
15          Probability Exists That Undue Prejudice Was Caused By
            Trial Counsel's Decision To Not Request California's
16          Standard Jury Instruction On Gang Activity Evidence.

17      Petitioner contends that his due process rights were violated

18  because his attorney failed to request one of California's standard

19  jury instructions advising jurors that they cannot use gang activity

20  evidence as propensity evidence.  (Petition at 11-12.)  Specifi-

21  cally, Petitioner claims that due to his attorney's failure to

22  request CALCRIM No. 1403, the jury felt it was free to convict

23  Petitioner because he was a person of bad character.  (Petition at

24  12-14.)  Respondent argues that the jury was given other proper

25  instructions as to the use of gang activity evidence, and that there

26  is no reasonable probability that if CALCRIM No. 1403 had been given

27  to the jury that the verdict would have been different.  (Respon-

28  dent's Points and Authorities at 9.)  CALCRIM No. 1403 states:

12cv1237

You may consider evidence of gang activity only for the limited purpose of deciding whether: The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements and special circumstance allegations charged; OR the defendant had a motive to commit the crimes charged; OR the defendant actually believed in the need to defend himself; OR the defendant acted in the heat of passion; OR [the court may insert another reason that they admitted the gang evidence].

You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.

You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.

1-1400 CALCRIM 1403.

In the California Court of Appeal, Petitioner argued that the judgment should be reversed because of his lawyer's failure to request a limiting jury instruction stating that evidence of gang activity could not be used to conclude that Petitioner had a bad character or criminal disposition. (Respondent's Lodgment No. 5.) The California Court of Appeal assumed arguendo that Petitioner's counsel's failure to request instruction in the language of CALCRIM No. 1403 was an oversight unsupported by a tactical reason. (Respondent's Lodgment No. 5 at 18.)  Nevertheless, the California Court of Appeal denied Petitioner's appeal of his conviction based on a lack of prejudice. (Id.)  Thereafter, Petitioner filed a Petition for Review in the California Supreme Court, which denied his Petition without comment. (Respondent's Lodgment No. 7.)  The last reasoned state court decision which addressed the merits of the claim is the California Court of Appeal's opinion affirming Petitioner's conviction. (Respondent's Lodgment No. 5.)  It is to

12cv1237

1    that decision this Court must direct its analysis.  Ylst, 501 U.S.

2    at 805-06.

3         Petitioner asserts two arguments as to why the California

4    Court of Appeal made an unreasonable application of the law when it

5    failed to find prejudice under Strickland.  (Petition at 12-14.)

6    First, Petitioner argues that the Court of Appeal unreasonably

7    applied the law when it presumed that the jurors knew not to use

8    gang activity testimony as evidence of the Petitioner's bad

9    character.  (Petition at 16.)  Second, he asserts that the Court of

10   Appeal unreasonably applied the law when it found prejudice lacking

11   because the Petitioner presented an identity defense.  (Petition at

12   17.) Both of these arguments lack merit.[4/]

13        The clearly established United States Supreme Court law

14   governing ineffective assistance of counsel claims is Strickland v.

15   Washington, 466 U.S. 668 (1984).  See Baylor v. Estelle, 94 F.3d

16   1321, 1323 (9th Cir. 1996).  In a petition for writ of habeas corpus

17   alleging ineffective assistance of counsel, the Court must consider

18   two factors.  Strickland, 466 U.S. at 687.  First, the petitioner

19   must show that counsel's performance was deficient.  Id.  Deficient

20   performance requires a showing that counsel made errors so serious

21   that he or she was not functioning as the "counsel" guaranteed by

22   the Sixth Amendment.  Id.  The petitioner must show that counsel's

23

24        [4/]Petitioner also claims in the Traverse and Memorandum of Points And
25   Authorities ("Traverse") that Respondent failed to address the allegations in the
     Petition.  (Traverse at 5.)  Petitioner incorrectly cites Rule 4 of the Rules
     Governing section 2254 as requiring more analysis than what was provided in the
26   Answer.  Assuming Petitioner meant Rule 5 of the Rules Governing section 2254,
     which states that "[t]he answer must address the allegations in the (continued)
27
     (continued)
28   petition," this Court finds no reason to believe that every single argument must
     be addressed, so long as Respondent's Answer substantially responds to the
     allegations asserted in the Petition.

12cv1237

1   representation fell below an objective standard of reasonableness,

2   and must identify counsel's alleged acts or omissions that were not

3   the result of reasonable professional judgment considering the

4   circumstances. Id. at 688; U.S. v. Quintero-Barraza, 78 F.3d 1344,

5   1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is

6   highly deferential. Strickland, 466 U.S. at 689. A court indulges

7   a strong presumption that counsel's conduct falls within the wide

8   range of reasonable professional assistance. Id. at 687.

9        Second, the petitioner must demonstrate that "there is a

10  reasonable probability that, but for counsel's unprofessional

11  errors, the result . . . would have been different." Id. at 694.

12  Petitioner must show that counsel's errors were so egregious as to

13  deprive defendant of a fair trial, one whose result is unreliable.

14  Id. at 687. The Court must evaluate whether the entire trial was

15  fundamentally unfair or unreliable because of counsel's ineffective-

16  ness. Id.; Quintero-Barraza, 78 F.3d at 1348.

17       A court need not determine whether counsel's performance was

18  deficient before examining the prejudice suffered by the petitioner

19  as a result of the alleged deficiencies. Strickland, 466 U.S. at

20  697. The court need not address both prongs if a petitioner fails

21  to make a sufficient showing of either one. Id. at 697. There is

22  no need to address deficiency of performance if prejudice is

23  examined first and found lacking. Id.

24       Federal habeas courts must defer to "state court findings of

25  fact made in the course of deciding an ineffectiveness claim."

26  Strickland, 466 U.S. at 698. Because "both the performance and

27  prejudice components of the ineffectiveness inquiry are mixed

28  questions of law and fact," Section 2254(d)(1)'s "unreasonable

1  application of" clause applies.   Id.; see Moore v. Calderon, 108

2  F.3d 261, 265 (9th Cir. 1997).

3      In response to Petitioner's challenge to his convictions, the

4  California Court of Appeal determined that "there is no reasonable

5  probability [the jury] thought it could use the gang activity

6  evidence to convict based on an inference that Petitioner had a

7  criminal predisposition rather than because guilt had been proven

8  beyond a reasonable doubt." (Respondent's Lodgment No. 5 at 18-19.)

9      The California Court of Appeal, for the sake of argument,

10 conceded the first prong of Strickland.   Addressing the issue of

11 trial counsel's performance, the Court of Appeal noted,

12         It is apparent from the record that defense counsel
           was concerned about the impact of the gang evidence on
13         the jury; accordingly, we will assume arguendo that
           his failure to request instruction in the language of
14         CALCRIM No. 1403 was an oversight unsupported by a
           tactical reason.
15
   (Respondent's Lodgment No. 5 at 18.)
16
17     However, the Court of Appeal determined that Petitioner

18 failed to meet the prejudice prong of Strickland.   (Respondent's

19 Lodgment No. 5 at 18.)  The Court of Appeal noted that there was not

20 a reasonable probability that the verdict would have been more

21 favorable to Petitioner absent the alleged ineffective assistance of

22 counsel.   (Respondent's Lodgment No. 5 at 18.)   Based on the

23 instructions and testimony that were given, the Court of Appeal

24 reasoned that the jury understood that they were not to use the gang

25 activity evidence as evidence of Petitioner's propensity to commit

26 crimes.   (Respondent's Lodgment No. 5 at 18-19.)   The Court of

27 Appeal reasoned that the jury also knew that they were not to use

28 the gang activity evidence to decide the element of identity.
   (Respondent's Lodgment No. 5 at 19-20.)

12cv1237

1    This Court agrees with the Court of Appeal.  This Court will
2    assume arguendo, like the Court of Appeal, that the failure to
3    request a jury instruction in the language of CALCRIM No. 1403 was
4    an error unsupported by a tactical reason.  During motions in
5    limine, defense counsel argued, and the court agreed, that evidence
6    of gang membership had a high risk of prejudicing the jury.
7    (Respondent's Lodgment No. 3 at 26.)  During the jury instruction
8    conference, after the gang activity evidence had been presented,
9    defense counsel presented jury instructions that did not specifi-
10   cally forbid the jurors from using gang activity evidence to
11   conclude that the Petitioner was a person of bad character or that
12   he had a disposition to commit crimes.  (Respondent's Lodgment No.
13   3 at 27.)  Since CALCRIM No. 1403 forbids the use of gang activity
14   evidence to conclude that a defendant had a propensity to commit
15   crimes, failure to request a limiting instruction creates a risk of
16   conviction irrespective of guilt of the crimes charged.

17   However, this Court also agrees that there was no prejudice.
18   The jury was given an instruction, similar to CALCRIM No. 1403, on
19   the expert gang activity testimony and the evidence regarding
20   Petitioner's gang membership.  (Respondent's Lodgment No. 5 at 18-
21   19.)

22   The jury was instructed on how to evaluate the expert opinion
23   testimony with the statement: "The opinion of Detective Collins in
24   this case, when testifying as an expert on gangs, was offered on the
25   issue of whether or not the crimes alleged were committed for the
26   benefit of, or in association with, a criminal street gang, and not
27   on the issue of the identity of the people involved.  That is for
28   you to determine."  The jury also was given a special instruction

12cv1237

1  stating: "If you find that the defendant is a member of a criminal
2  street gang, that fact by itself is insufficient to convict him of
3  the crimes charged." (Respondent's Lodgment No. 5 at 18.)

4      The trial court limited the gang activity evidence to general
5  background information and the elements of the gang enhancement.
6  (Respondent's Lodgment No. 5 at 18-19.)  There is no evidence in the
7  record to support the argument that the jury improperly used the
8  gang activity evidence as proof of Petitioner's predisposition or
9  bad character.  Additionally, there is no evidence in the record
10  that the jury used evidence of Petitioner's gang membership to
11  establish the issue of identity.

12      B.   The Court Of Appeal Did Not Unreasonably Apply The Law
              When It Presumed The Jury Knew Not To Use Gang Testimony
13            As Propensity Evidence

14       First, Petitioner argues that the Court of Appeal unreason-
15  ably applied the law when it presumed that the jury knew not to use
16  gang activity evidence as evidence of Petitioner's bad character.
17  (Petition at 16.)  In support of this claim, he contends that the
18  Court of Appeal used an illogical analysis.  (Id.)  Further, he
19  asserts that the jury was never told not use gang activity evidence
20  as evidence of Petitioner's bad character.  (Id.) As a result,
21  Petitioner claims this error in instruction caused him prejudice.
22  (Id.)

23      Petitioner fails to raise a federal claim in this regard.
24  The role of a federal habeas court is limited to "deciding whether
25  a conviction violated the Constitution, laws, or treaties of the
26  United States." 28 U.S.C. § 2254 (a).  The Supreme Court has held
27  that claims of instructional error to state court juries "generally
28  may not form the basis for federal habeas relief." Gilmore v.

17

12cv1237

1   <u>Taylor</u>, 508 U.S. 333, 343-44 (1993).  Federal habeas relief may only

2   be had when an erroneous jury instruction has infected the trial

3   process to the point that the resulting conviction violates due

4   process.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991).  The Court

5   must presume jurors followed the instructions given and applied the

6   proper legal standard.  <u>See</u> <u>Richardson v. Marsh</u>, 481 U.S. 200, 206

7   (1987).  In order to violate due process, there must be a reasonable

8   likelihood that the jury applied the erroneous jury instruction in

9   a way that relieved the prosecution of its burden of proof.  <u>See</u>

10  <u>Waddington v. Sarausad</u>, 555 U.S. 179, 190-91 (2009).  In this case,

11  federal habeas relief is precluded even if there was an erroneous

12  failure to instruct the jury with the language of CALCRIM No. 1403,

13  because Petitioner has not shown a reasonable likelihood that the

14  jury applied it in a way to relieve the prosecution of its burden of

15  proof.

16       The California Court of Appeal, as the law allows, presumed

17  that the jury followed the instructions they were given.  <u>See</u>

18  <u>Richardson</u>, 481 U.S. at 206; Respondent's Lodgment No. 5 at 19-20.

19  It held that the given instructions adequately informed the jurors

20  as to the limited the purpose for which the gang activity evidence

21  presented could be used.  (<u>Id.</u>)  Thus, the court reasoned that the

22  jury knew not to use the gang activity evidence as evidence of

23  Petitioner's bad character.  (Id.)

24       Even if this Court were to assume that Petitioner presents a

25  cognizable federal claim in this regard, the California Court of

26  Appeal did not unreasonably apply the law by presuming the jury knew

27  not to use the gang activity evidence as evidence of the Peti-

28  tioner's bad character.  In fact, the jury was instructed that

1  Petitioner could not be convicted of the crimes charged based on
2  evidence that Petitioner is a member of a criminal street gang.
3  (Respondent's Lodgment No. 2 at 655.)  The jury was told to use the
4  gang activity evidence *only* for deciding the truth of the gang
5  enhancement, and that it was not to be considered on the issue of
6  identity.  (Respondent's Lodgment No. 2 at 645.)  The gang activity
7  testimony that was admitted was directly relevant to the elements of
8  the gang enhancement.  (Respondent's Lodgment No. 5 at 19-20.)
9  Additionally, both of the instructions that were given to the jury
10  regarding the gang activity evidence, while not in the exact
11  language of CALCRIM No. 1403, were given in a way that would make
12  it easy for a lay person to understand and correctly apply.

13      Moreover, a reasonable jury would have understood that it had
14  to separately evaluate the evidentiary support for each element of
15  the substantive crimes and gang enchantments.  The jury was
16  instructed that the prosecution must prove each element of the
17  crimes beyond a reasonable doubt.  (Respondent's Lodgment No. 5 at
18  19.)  The gang expert's testimony was limited to general background
19  information about gangs and the evidence necessary to prove the gang
20  enhancement.  (Id.)  The elements for the gang enhancement and the
21  crimes charged were delineated for the jury.  (Id.)  Furthermore,
22  the jury was instructed that it could not convict Petitioner of the
23  charged offenses merely because he was a gang member.  (Id.)

24      From these instructions and testimony, it is reasonable to
25  assume that the jury understood that it should not infer from the
26  Petitioner's gang background that he was guilty of the crimes
27  charged.  The presumption that the jury knew not to use the gang
28

12cv1237

activity evidence as evidence of the Petitioner's bad character was not an unreasonable application of the law.

        C.   <u>The Court Of Appeal Did Not Unreasonably Apply Federal Law When It Found That The Jury Understood That It Was Not To Use Evidence Of Gang Membership To Establish The Issue Of Identity</u>

In a claim closely related to Petitioner's first claim, Petitioner asserts that the Court of Appeal unreasonably applied the law when it found that the jury understood that it was not to use evidence of gang membership to establish the issue of identity. (Petition at 17.) He asserts that the trial judge's instruction to the jury gave it permission to convict Petitioner using the gang activity evidence, because they were told it was permissible as long it was not used "by itself" to convict him. (Petition at 14.) Further, he asserts that this instruction was prejudicial. (<u>Id.</u>) Petitioner claims that the Court of Appeal implied that the jury could use evidence of gang membership to prove identity "so long as something 'apart from' it existed too," and that the Court of Appeal's implication is an unreasonable application of the law. (Petition at 18.) Additionally, Petitioner claims that the prosecution's closing argument invited the jury to use the gang activity evidence as proof of his criminal disposition; specifi- cally, the fact that the prosecutor referred to Petitioner as a "predator", as a "different kind of person," and questioned Petitioner's "character". (<u>Id.</u>) Petitioner argues that it is only a "small hop" connecting the prosecutor's descriptions of Peti- tioner's character as a "predator" to using the gang activity testimony as propensity evidence. (<u>Id.</u>) Petitioner claims that the jury's lack of understanding on how to properly use the gang activity evidence on the issue of identity, combined with the

1    prosecutor's closing argument, established prejudice.  (Id.)

2    However, as will be discussed below, the trial court's instructions

3    to the jury regarding the gang activity evidence, combined with the

4    prosecutor's choice of language in closing argument, when analyzed

5    in its entirety, cannot reasonably be construed as to have given the

6    jury permission to use the gang activity evidence as propensity

7    evidence or for any other improper use.

8        A defendant is not entitled to any particular form of an

9    instruction, so long as the instructions given fairly and adequately

10   cover his theories of defense. United States v. Dixon, 201 F.3d

11   1223, 1231 (9th Cir. 2000).  No prejudice results from a court's

12   attempt to define a concept so as to be "within the comprehension of

13   the average juror."  Id.  Closing arguments are relevant to

14   determining prejudice.  Doody v. Ryan, 649 F.3d 986, 1022 (9th Cir.

15   2011) (considering closing argument in judging whether constitu-

16   tional errors were harmless.)

17       The Court of Appeal found that the jury knew the issue of

18   identity, and of Petitioner's guilt on the charges, must have been

19   decided independently from the gang activity evidence; specifically,

20   the testimony of the gang expert and the evidence of Petitioner's

21   gang membership.  (Respondent's Lodgment No. 5 at 19.)

22       The Court of Appeal's conclusion that jury understood it was

23   not to use evidence of gang membership to establish the issue of

24   identity was not an unreasonable application of federal law.  The

25   jury was given the explicit instruction that it could not determine

26   the issue of identity using gang activity evidence. (Id.) The jury

27   was told multiple times, by the judge and by counsel, the limited

28   purpose for which it could use the evidence of the Petitioner's gang

1    membership. (<u>Id.</u> at 18-20.) Moreover, the jury also was specifi-

2    cally instructed about the prohibited purpose in using the gang

3    membership evidence. (Id.) During his closing argument, the

4    prosecutor referred to Petitioner as a "predator," and posed the

5    rhetorical question, "[W]hat kind of character and what kind of mind

6    does it take to think, you know what, I'm going to go hunting

7    tonight[?]" (Respondent's Lodgment No. 1 at 656-57.) The prosecu-

8    tor posed that rhetorical question several times at the beginning of

9    his closing argument, describing Petitioner as, "[A] different kind

10    of person." (<u>Id.</u> at 656-58.) However, he also told the jury that

11    the purpose of the gang activity evidence was not to "just dirty

12    people up," but rather, was to prove the elements of the gang

13    enhancement, "which is required to be proved under the law." (<u>Id.</u>

14    at 679.) The prosecutor then went on to delineate the elements of

15    the gang enhancement. (<u>Id.</u> at 679-83.) Not once did the prosecutor

16    tell the jury to use the gang activity evidence for anything other

17    than deciding the gang enhancement allegation. Additionally, in

18    closing argument, Petitioner's defense counsel told the jury that it

19    could not base its conclusion that the Petitioner was one of the

20    perpetrators on the fact that Petitioner was a gang member. (<u>Id.</u>)

21    The jury was instructed in plain language, many times, exactly how

22    and for what purpose the gang activity evidence was to be properly

23    used. Therefore, the California Court of Appeal did not unreason-

24    ably apply the law when it found that the jury knew it was not to

25    use evidence of gang membership to establish the issue of identity,

26    even without the exact language of CALCRIM No. 1403.

27       In sum, there is no reasonable probability that the jury

28    improperly relied on gang activity evidence as propensity evidence.

12cv1237

1    Thus, the Court of Appeal's denial of Petitioner's claim was neither

2    contrary to, nor an unreasonable application of, clearly established

3    federal law.   Therefore, this Court RECOMMENDS that Petitioner's

4    claim for habeas relief in this regard be DENIED.

5                                    VI

6                     CONCLUSION AND RECOMMENDATION

7         After a review of the record in this matter, the undersigned

8    Magistrate Judge RECOMMENDS that the Petition for Writ of Habeas

9    Corpus be DENIED with prejudice.   This Report and Recommendation of

10   the undersigned Magistrate Judge is submitted to the United States

11   District Judge assigned to this case, pursuant to the provision of

12   28 U.S.C. § 636(b)(1).

13        IT IS ORDERED that no later than December 3, 2012, any party

14   to this action may file written objections with the Court and serve

15   a copy on all parties.   The document should be captioned "Objections

16   to Report and Recommendation."

17        IT IS FURTHER ORDERED that any reply to the objections shall

18   be filed with the Court and served on all parties no later than

19   December 17, 2012.   The parties are advised that failure to file

20   objections within the specified time may waive the right to raise

21   those objections on appeal of the Court's order.   Martinez v. Ylst,

22   951 F.2d 1153, 1156 (9th Cir. 1991).

23   IT IS SO ORDERED.

24   DATED:   October 30, 2012

25

26   _____

27                                   Hon. William V. Gallo
                                     U.S. Magistrate Judge
28

12cv1237